UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

ROY VAN NORTRICK #708819     CIVIL ACTION NO. 21-cv-3848

VERSUS     JUDGE S. MAURICE HICKS, JR.

TIM HOOPER     MAGISTRATE JUDGE HORNSBY

## REPORT AND RECOMMENDATION

**Introduction**

A unanimous Caddo Parish jury convicted Roy Arlen Van Nortrick ("Petitioner") of two counts of molestation of a juvenile. He was sentenced to two consecutive 45-year sentences, with the first 25 years of each sentence to be served without benefits. The convictions and sentences were affirmed on appeal. State v. Van Nortrick, 244 So.3d 810 (La. App. 2d Cir. 2018), writ denied, 256 So.3d 284 (La.), cert. denied, 139 S.Ct. 1185 (2019). Petitioner filed a post-conviction application in state court, and all claims were denied. He now seeks federal habeas corpus relief on the grounds that (1) the evidence was insufficient to support his convictions, (2) the trial court improperly admitted an involuntary statement that Petitioner gave police, and (3) he received ineffective assistance of trial counsel. For the reasons that follow, it is recommended that the petition be denied.

**Relevant Facts**

Sisters J.M. and R.M. went to live with their aunt, Shelly Clark, after a serious auto accident that resulted in their mother's incarceration. J.M., the older sister, suffered a fractured skull and traumatic brain injury in the accident. She kept a journal as part of her

memory rehabilitation. Ms. Clark testified that she was told to read the journal for accuracy, which led to her seeing entries by J.M. about improper activities by Petitioner with both girls. Ms. Clark spoke with the girls, who confirmed the descriptions in the journal. Ms. Clark promptly reported the matter to law enforcement.

Alex Person was a forensic interviewer at the Gingerbread House, a local children's advocacy organization that often provides interviewers of sexually abused children. Ms. Person testified that she interviewed the girls separately, using non-leading questions, to gather information. Person identified video recordings of the interviews, which were played for the jury.

The girls' father, P.M., testified that his household included his wife, his son, and his daughters. He said that Petitioner and Petitioner's young son also lived in the home during 2009 and 2010. P.M. worked two jobs at the time, and his wife was hospitalized during some of the time Petitioner lived with them. P.M. testified that Petitioner exercised control or supervision over both R.M. and J.M. at various times. P.M. was not aware of the sexual abuse of his daughters, but he suspected that Petitioner was having a sexual affair with his wife.

J.M. was 13 at the time of her Gingerbread House interview. She later testified at trial that she recalled the interview, which was then played in open court.[1] In the video, J.M. stated that Petitioner "put his finger in me" and "tried to put his you know what in me." She also said that Petitioner "tried to put his you know what in my butt" and wanted

---

[1] The content of the Gingerbread House videos was not transcribed by the court reporter, but the State has filed transcripts under seal. Doc. 13, Exs. 5 & 6.

her to "touch his you know what," but she refused. J.M. used anatomical drawings to mark the body parts she described. J.M. said that she witnessed Petitioner putting his finger in RM.'s "tee tee" and tried to put his penis in R.M.'s "tee tee" and anus. J.M. said that she believed Petitioner was having sex with her mother when he lived with them. J.M. testified at trial that what she said in the interview actually happened.

J.M. said in the Gingerbread House interview that another man who lived with the family, earlier and at another location, also abused her and had a sexual relationship with her mother. She was able to recall and separately describe the acts of abuse committed by the two men. She conceded on cross-examination that at the time she wrote her journal entries about the abuse she was having difficulty with long-term and short-term memory and having visions and hearing voices. This was related to the car accident that shattered her skull, required nine surgeries, and left her partially blind.

R.M. was 11 at the time of her Gingerbread House interview. A video recording of her interview was played at trial. In the video, R.M. said that Petitioner forced her and her sister to get in the shower with him. She said that Petitioner forced her to put her mouth on his "toy" or "thing," and he put his finger in her "toy." She said that he also touched her "toy" with his tongue while he made her put her mouth on his "thing." She said that Petitioner put his "toy" in her mouth, vagina, and anus.

R.M. testified at trial that she told the truth during her interview. She said that the incidents occurred more than five times. She was asked about notes that she took before the interview, and she said that she intended to bring the notes to the interview in case she forgot something, but she left them in her aunt's purse. Part of the defense theory was that

the girls made up the claims because they were angry that Petitioner left Louisiana and took his son, who was their cousin. R.M. stated on cross-examination that she was upset when Petitioner left Louisiana because she missed his son. She also admitted that she "probably" contacted Petitioner on social media and asked him to bring her cousin back to Louisiana.

Detective Jared Marshall, a youth services detective with the Caddo sheriff, testified that he spoke with Ms. Clark after the abuse was reported. He said that at the time the girls were molested by Petitioner, approximately 2009-2010, J.M. would have been nine or ten, and R.M. would have been seven or eight.

Petitioner was arrested in Michigan and transported to Shreveport, where Detective Marshall interviewed him. Petitioner signed forms indicating his understanding and waiver of his <u>Miranda</u> rights. The recorded interview, in which Marshall's partner also participated near the end, lasted more than three hours. Petitioner described some of his family history, which he said included his stepfather, who raised him from an early age, being convicted of molesting Petitioner's two younger stepbrothers. He said the man also molested him and a sister.

Petitioner described the living arrangements in the home and admitted to having sex with the girls' mother. At first, he denied molesting the girls, but details of molestation came out during the course of the interview. He talked about the youngest girl getting in bed with him and saying that they were married. He eventually allowed that the girls would try to get in the shower with him, and he would slap them on their bare behinds to get them to leave. He said that there was once a time when he was on Percocet for a tooth problem,

and he would awaken in bed with the girls with him, but he did not recall doing anything with them. Petitioner referred several times to being diabetic and having other health problems, and he suggested that he may have done things while blacked out and that perhaps he thought the girls were their mother. He also suggested that the mother may have drugged his coffee at times, causing memory loss of hours of time.

Petitioner eventually admitted that he had touched J.M.'s vagina, had anal sex with J.M., and that she performed oral sex on him. He admitted to performing oral sex on R.M. and said that R.M. touched his penis with her hand. He said that the girls witnessed each other's abuse and that he achieved an orgasm as a result of some the acts. He said that his diabetes prevented him from ejaculating, which was consistent with statements from the victims. He generally portrayed the girls as the sexual aggressors, but he admitted to engaging in various sexual acts with them.

Petitioner testified at trial as the only witness for the defense. He denied touching either of the girls or acting inappropriately with them. He explained his statement to police by saying that he was diabetic and did not receive any of his prescribed insulin on the day of the statement. He said that this caused him to suffer from "high sugar" and that he had no memory of his arrival in Shreveport or his statement to the police that evening. During cross-examination, Petitioner said that he did not remember doing any of the abusive acts that he described in his statement, but he said that he did occasionally supervise the girls when he lived with them. He claimed that the girls' accusations were motivated by him taking his son, their cousin, with him when he left Louisiana.

**Sufficiency of the Evidence**

Petitioner was charged with molestation of a juvenile which, in 2009 and 2010 when the acts took place, La. R.S. 14:81.2 defined as:

> A. Molestation of a juvenile is the commission by anyone over the age of seventeen of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons, with the intention of arousing or gratifying the sexual desires of either person, by the use of force, violence, duress, menace, psychological intimidation, threat of great bodily harm, or by the use of influence by virtue of a position of control or supervision over the juvenile. Lack of knowledge of the juvenile's age shall not be a defense.

Petitioner's principal argument is that the State did not prove that he accomplished the acts "by the use of influence by virtue of a position of control or supervision over the juvenile." Petitioner also argues that the girls were not credible because they stumbled with some answers on cross-examination, admitted to having notes prepared for their interviews, and J.M. was affected by her traumatic brain injury and memory problems.

In evaluating the sufficiency of evidence to support a conviction "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 99 S.Ct. 2781, 2789 (1979). The Jackson inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." Herrera v. Collins, 113 S.Ct. 853, 861 (1993).

The jury's verdict was unanimous. The state appellate court decided a sufficiency of the evidence challenge on the merits on direct appeal. Habeas corpus relief is available

with respect to a claim that was adjudicated on the merits in the state court only if the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d). Thus, a state-court decision rejecting a sufficiency challenge is reviewed under a doubly deferential standard. It may not be overturned on federal habeas unless the decision was an objectively unreasonable application of the deferential Jackson standard. Parker v. Matthews, 132 S.Ct. 2148, 2152 (2012); Harrell v. Cain, 595 Fed. Appx. 439 (5th Cir. 2015).

The state appellate court reviewed the statute that defined the crime, set forth all of the relevant evidence, acknowledged the applicable Jackson standard, and assessed Petitioner's arguments. The court noted that Petitioner testified that he was 35 and 36 years old during the time he lived with the girls and their parents. There was testimony that the girls were under the age of 13 at the time, and the jury heard the testimony of the victims and their Gingerbread House interviews in which they described their ages and the various sexual acts Petitioner performed on them. The testimony and statements of J.M. and R.M. were corroborative of each other.

The jury heard testimony and argument about the effect of the car accident on J.M., the girls' awareness that Petitioner had an affair with their mother, the girls missing their cousin, and the like. The appellate court held that the jury's unanimous decision to accept the testimony of the children as truthful and reject Petitioner's testimony was reasonable

and entitled to great weight, which rendered his insufficiency of the evidence challenge without merit. State v. Van Nortrick, 244 So.3d at 813-18.

With respect to the "use of influence element," Louisiana courts have held that the statute is not restricted in its application to persons to whom the parent entrusts the child for care, such as a babysitter or teacher. The statute permits finding evidence of supervision or control by noncustodial parents, relatives, friends, and neighbors of young victims. State v. Coffey, 349 So. 3d 647, 653 (La. App. 2d Cir. 2022), writ denied, 352 So. 3d 89 (La. 12/20/22). Living in the home with the victim, acting as a father figure to the victim, and exercising emotional control over the victim have been found to be sufficient to support a finding of supervision or control. Id. Louisiana courts consider the following factors when assessing whether a defendant used influence by virtue of his position of supervision or control over the victim: (1) the amount of time the defendant spent alone with the victim; (2) the nature of the relationship between the victim and the defendant; (3) the defendant's age; and (4) the defendant's authority to discipline. Id.

The state court specifically considered Petitioner's argument that the State did not prove the "use of influence" element. The girls' father testified that, at the time Petitioner lived in his home, the father worked at a local car dealership and then worked nights for a parcel delivery company. His wife stayed home but was unable to work and was at times hospitalized. He was specifically asked if, during the time Petitioner lived with the family, Petitioner had control or supervision over J.M. and R.M. He answered, "Yes." Tr. 464-65. Petitioner was also asked if he ever had supervision over the girls or any of the other children in the household. He allowed that he did "once in a while." Tr. 575-76. Petitioner

had been married to the girls' mother's stepsister, so he was their uncle by marriage. Tr. 466.

Petitioner said at about the 40-minute mark of his police interview that he would let the children do things that their parents wouldn't. For example, the parents did not let their children outside. But when the parents were gone, or when the mom was stoned on pills, Petitioner would tell the children to go outside and play. When the children asked who would watch them, he said that he would. He told them that if they wanted to leave the yard or play with neighbors to open the door and let him know what they were doing. At about 1:50, he said that the girls would sometimes run through the house naked after a bath, and he would yell at them to put on clothes because that was inappropriate. He said at about 1:59 that he yelled at the girls to never get in the shower with him, and he said at 2:35 that he once told R.M. to go put on underwear. Those actions all suggest that Petitioner exercised a degree of authority and supervision over the girls.

Thus, Petitioner was an adult male relative who was at the time a permanent resident of the household. The mother was often hospitalized or incapacitated, and the father was often away from home working day and night, leaving Petitioner as the only adult in the home for significant periods of time when the parents were absent or inattentive. He was 35 and 36 years old at the time, and the girls were 10 or younger. The state appellate court found that the evidence was sufficient to support the jury's finding with respect to the "use of influence" element. State v. Van Nortrick, 244 So.3d at 817.

The state court's assessment of the relevant evidence was entirely reasonable under the Jackson standard. Petitioner contends that there was a lack of evidence for the "use of

Page 9 of 20

influence by virtue of a position of control or supervision" element, but a rational juror could have found that Petitioner had such a position in the setting of the household. When the state court's affirmance of that verdict is viewed through the doubly deferential habeas standard of Section 2254(d), there is no basis to vacate the convictions.

Petitioner generally attacks the credibility of the girls based on J.M.'s head injury, the reference to notes, potential motives such as his affair with their mother and taking his son out of state, but the jury heard about and was able to consider those factors. It made a reasonable decision to find the girls credible despite those matters, and "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." Cavazos v. Smith, 132 S.Ct. 2, 4 (2011). "[U]nder Jackson, the assessment of the credibility of the witnesses is generally beyond the scope of review." Schlup v. Delo, 115 S.Ct. 851, 868 (1995). There is no basis for habeas relief with respect to Petitioner's challenges to the sufficiency of the evidence.

**Admission of Petitioner's Statement**

Defense counsel filed a motion to suppress Petitioner's statement to police, and the state court held an evidentiary hearing. Sgt. Michael Middleton testified that he and his partner flew to Michigan to pick up Petitioner and bring him back to Caddo Parish. He said that Petitioner was submissive and compliant during the trip. Middleton was asked if Petitioner mentioned being diabetic or insulin dependent. He said that Petitioner may have said something of that nature, but he was uncertain because he transports a lot of people. He testified that the deputies make sure the persons being transported are well-hydrated and get a meal, depending on availability on the flight or at the airport. Tr. 236-41.

The State played the video recording of the interview, which was about three hours and 15 minutes long. Tr. 247-48. The court reporter did not transcribe the interview, but the State has filed under seal a disk of the recorded interview. Doc. 9-5; Ex. 1 to state court record. Detective Marshall testified that he interviewed Petitioner at a criminal investigation office, which is like a business office for detectives that is located north of downtown Shreveport. Petitioner arrived from the airport, and he accepted an offer of coffee. Shackles were removed from his hands but left on his legs. Marshall said that Petitioner was friendly and talkative, even joking about a few things.

Detective Marshall testified (Tr. 261-89) that he advised Petitioner of his Miranda rights, and Petitioner signed forms to indicate that he understood his rights and waived them to speak with the investigators. Marshall said that Petitioner "seemed completely coherent and completely aware mentally about what he was signing" that evening. He testified that there were no threats or use of force, and it was just a normal conversation. Marshall said that, at the end of the interview and after Petitioner made several admissions, Petitioner mentioned that he needed to get some food because of his blood sugar. This apparently happened after the recording ended and when Petitioner was taken to the bathroom. Marshall testified that the detectives made sure that a patrol unit took Petitioner promptly to nearby Caddo Correctional Center where he could be attended to by the medical staff if needed. Other than "some general fatigue," the detective did not notice any change in Petitioner's appearance. Even after the interview was finished, Petitioner was "still talkative and coherent." Marshall saw no behavior that gave him cause for

concern. The detective did not recall Petitioner saying that his diabetes affected his memory.

Petitioner elected to testify at the hearing. Tr. 295-330. He testified that he had diabetes, second-stage kidney failure, had two toes amputated, and had impaired vision, all related to diabetes. He said that he was insulin-dependent and administers injections four to six times a day. Petitioner said that he was arrested a little after 7:00 a.m. one morning when he had not yet had his insulin. He was taken to jail and allowed to give himself insulin. He did not have any insulin the morning that he got on the flight from Michigan to Shreveport, and his last insulin shot was at 8:00 p.m. the night before. (The detective testified that the interview in Shreveport began around 8:00 p.m. the next day.) Petitioner testified that he did not remember arriving in Shreveport, and the last place he remembered was Houston. He was not given any insulin during the trip. Petitioner testified that he did not even remember meeting Detective Marshall. He said that when he does not receive his insulin, he loses track of where he is, does not know what he says or does, and is sometimes violent. He said he did not remember the interview and, when watching the video, wondered why he was "babbling like I was back and forth, because other than that I don't talk that much."

Judge Brady O'Callaghan accepted that Petitioner had Type 1 insulin-dependent diabetes. He did not believe that there was any showing of misconduct by law enforcement, and he saw nothing in the video to suggest to him, as a layperson, that Petitioner's health was in any way compromised. Petitioner was, he found, "quite lucid, quite conversational," though near the end of the video Petitioner did make some reference to

concerns about his blood sugar. The judge noted that Petitioner made statements that indicated he understood where he was, such as wanting to get back to his son in Michigan. He was repeatedly offered beverages and access to the restroom, and he never appeared confused. His responses included details and coherent narratives that suggested sufficient awareness. Petitioner tried to limit the consequences of his admissions (he tried more than once to bargain for probation administered in Michigan), which indicated his understanding of the events. The motion to suppress was denied. Tr. 335-40.

Petitioner argued on direct appeal that the trial court erred in denying his motion to suppress. The appellate court reviewed the evidence from the hearing and held that the trial court did not err. The court noted the lack of evidence to indicate to law enforcement that Petitioner needed medical treatment or was unable to understand his rights. There was, in contrast, evidence that Petitioner was lucid, conversational, and giving coherent and detailed answers. There was no showing of any coercive police activity. For those and other reasons the challenge was found to be without merit. State v. Van Nortrick, 244 So.3d at 817-19.

Petitioner argues that his lack of insulin undermined his ability to give a knowing and intelligent waiver of his Miranda rights and prevents the State from meeting its burden of showing that he gave a free and voluntary statement. The state court made factual findings that Petitioner's mental status was not affected by his diabetes during his interview. "[A] determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). "The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." Id.

Furthermore, habeas corpus relief is available with respect to a claim that was adjudicated on the merits in the state court only if the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d). It is not enough for a federal court to disagree with the state court. Rather, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 131 S.Ct. 770, 786-87 (2011).

It is only police coercion that can render a statement involuntary within the meaning of the Fourteenth Amendment. The influence of Petitioner's alleged mental condition, apart from any official police coercion, is not determinative. Colorado v. Connelly, 107 S.Ct. 515 (1986) (murder confession by mentally ill man was voluntary because "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause"). Mental impairment or intoxication are considerations in determining the voluntariness of a statement, but only when there is also official coercion. See James v. Cain, 468 Fed. Appx. 401 (5th Cir. 2012) (denying habeas by mentally challenged man who waived Miranda and confessed to murder); Martinez v. Quarterman, 270 Fed. Appx. 277, 290 (5th Cir. 2008) (denying habeas claim of being intoxicated when giving a written confession); Sosa v. Dretke, 133 Fed. Appx. 114, 119

(5th Cir. 2005) (denying habeas to petitioner who made statements when he had a mental impairment but in the absence of police coercion); and Lloyd v. Vannoy, 2021 WL 5830610, *12 (W.D. La. 2021) (denying habeas by petitioner who argued that his mother persuaded him to give a statement).

There was no evidence of police coercion. Petitioner suggests that the deputies intentionally withheld insulin, but there is no factual basis for that claim, and the state court's findings rejected any claims of mistreatment. The recoding of the interview shows that Petitioner was treated well. He was asked near the 2:30 mark if he had eaten anything that day, and he said, "I'm fine." He asked for coffee a few minutes later and said that was all he needed. When he expressed concern about his blood sugar, after the interview, he was taken to the local jail where medical staff could attend to his needs. If Petitioner's mental status influenced his statement, that was not attributable to any improper coercion. The trial court's denial of the motion to suppress, and the appellate court's affirmance of that decision, were not objectively unreasonable applications of any clearly established Supreme Court precedent. Habeas relief is not permitted on this claim.

**Ineffective Assistance of Counsel**

    A. Introduction

Petitioner argues that his attorney rendered ineffective assistance of counsel in two ways. To prevail, Petitioner must establish both that (1) his counsel's performance fell below an objective standard of reasonableness and (2) had counsel performed reasonably, there is a reasonable probability that the result in his case would have been different. Strickland v. Washington, 104 S.Ct. 2052, 2064 (1984). "Failure to make the required

showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." Id. at 2071.

### B. Habeas Burden

Petitioner's Strickland claims were adjudicated and denied on the merits by the state court, so 28 U.S.C. § 2254(d) directs that the question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether the determination was unreasonable, which is a substantially higher threshold. Schriro v. Landrigan, 127 S.Ct. 1933, 1939 (2007). The Strickland standard is a general standard, so a state court has even more latitude to reasonably determine that a defendant has not satisfied it. The federal court's review is thus "doubly deferential." Knowles v. Mirzayance, 129 S.Ct. 1411, 1420 (2009). For the federal court to grant relief, "[t]he state court decision must be so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Woods v. Etherton, 136 S. Ct. 1149, 1151 (2016) (per curiam) (quotation marks removed).

### C. Failure to Investigate Medical Condition

Petitioner argued in his post-conviction application and his habeas petition that counsel was ineffective because he did not adequately investigate the effect of diabetes and the lack of insulin on a person's mental state. He argues that defense counsel was limited in his examination and presentation at the hearing because he had not properly researched the unique and serious medical condition at issue. Judge Charles Tutt addressed this claim in a ruling on the post-conviction application. He reviewed the appellate court's findings that there was nothing in the record to indicate to law enforcement that Petitioner needed

medical treatment or was unable to understand his rights. Rather, the trial judge found that Petitioner appeared lucid, conversational, and oriented to time and place during his statement. The court also found a lack of evidence of threats or coercion by police. Judge Tutt noted that Petitioner presented a theory about what counsel might have learned had he done more research but, given the facts and applicable law, there was no proof that counsel's performance was deficient with respect to the motion to suppress. Tr. 955, 960-61.

The state appellate court summarily denied an application for review. Tr. 1058. The Supreme Court of Louisiana also denied a writ application. It wrote that Petitioner "fails to show that he received ineffective assistance of counsel under the standard of Strickland[.]" Tr. 1187-88.

Counsel's performance was not deficient for lack of additional research on the presentation of evidence regarding the effect of diabetes. The state court found that Petitioner was not suffering from any of the potential symptoms associated with a lack of insulin. Furthermore, suppression would have been obtained only if there was also a showing of police coercion, and there was not. No amount of additional presentation by counsel on the potential effects of diabetes would have made up for the lack of coercion. The state court's denial of this claim was a reasonable application of Strickland to the record and does not permit habeas relief under the doubly deferential standard.

### D. No Child Abuse Expert

Petitioner argued in his post-conviction application that counsel should have consulted with or hired an independent child sexual abuse expert. He suggests that the

expert could have helped rebut the claims of the victims that they were sexually abused. Judge Tutt noted that the State did not present any expert witnesses to which the defense needed to respond, and Petitioner's suggestions about how the expert might have helped were "pure speculation." Thus, counsel was not deficient for not consulting an expert, and there was no demonstration of related prejudice. Tr. 955, 961-62. The state appellate court summarily denied a writ application. The Supreme Court of Louisiana denied a writ and wrote that Petitioner failed to show that he received ineffective assistance of counsel under the standard of Strickland. Tr. 1187-88.

The state court's denial of this claim was not an objectively unreasonable application of Strickland. Petitioner has not identified an expert who could have been called on this issue, nor has he presented any evidence concerning what the expert would have testified. Such "unsupported claims regarding the uncalled expert witness are speculative and disfavored by [the Fifth Circuit] as grounds for demonstrating ineffective assistance of counsel." Evans v. Cockrell, 285 F.3d 370, 377 (5th Cir. 2002). Petitioner must be able to show a reasonable probability that, but for counsel not hiring such an expert, the jury would have had a reasonable doubt concerning Petitioner's guilt. Id. Petitioner cannot meet that burden based on his mere speculation that there may be such an expert out there somewhere who might have helped. Allen v. Stephens, 619 Fed. Appx. 280, 287 (5th Cir. 2015) (no prejudice shown where there was no evidence expert would have testified favorable to the defense). Petitioner is not entitled to habeas relief on this final claim.

Accordingly,

It is recommended that Petitioner's petition for writ of habeas corpus be denied.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b).  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

An appeal may not be taken to the court of appeals from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice, circuit judge, or district judge issues a certificate of appealability. 28 U.S.C. § 2253(c); F.R.A.P. 22(b).  Rule 11 of the Rules Governing Section 2254 Proceedings for the U.S. District Courts requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate may issue only if the applicant has made a substantial showing of the denial of a constitutional right. Section 2253(c)(2). A party may, within fourteen (14)

days from the date of this Report and Recommendation, file a memorandum that sets forth arguments on whether a certificate of appealability should issue.

THUS DONE AND SIGNED in Shreveport, Louisiana, this 7th day of September, 2023.

Mark L. Hornsby
U.S. Magistrate Judge